Would the clerk call the case, please? 3-14-06-69, William and Julia Clark, athletes, by William Heitkens v. The Village of LaMoille, talent by Jennifer Turriello. Ms. Turriello, good morning. May it please the Court. Counsel, again, my name is Jennifer Turriello. I'm here this morning representing the Apple Land Village of LaMoille. The Village is raising three challenges to the trial court's denial of its request for post-trial relief in this case. First, the plaintiff's claims are barred by Section 2201 of the Tort Immunity Act, and the second and third contentions of error relate to the failure to introduce evidence of proximate cause at trial. I'll address each of these arguments in turn. The Village's decision to delay further investigation and repair of the storm sewer drain tile at issue until late March of 2009 was both an exercise of discretion and a determination of policy, as opposed to a ministerial act, thereby rendering 2201 immunity applicable to these claims. Here, the determination to wait until late March of 2009 to repair the storm sewer drain tile was the result of reasoned deliberation and an affirmative decision-making process. Further, there was no plan, no policy, no statute or regulation in place that directed the Village Board as to how it should handle the repair work and specifically the timing of the repair work. 2201 of the Tort Immunity Act confers immunity for discretionary functions by a public employee. You must have both a discretionary act and a policy determination in order to garner that immunity. In contrast, as we know, ministerial tasks do not get protected by 2201. Discretionary immunity gets applied to the employing governmental entity through 2109 of the Act. It's a two-pronged analysis. Case law has worn that out. You have an employee position prong, which is, is this employee at issue somebody who, in the hierarchy or rank, is someone who makes policy determinations or someone who exercises discretion. And the second prong of the analysis is whether or not the plaintiff's claims implicate a discretionary policy determination. It's that second prong that's at issue here in this case. No one's disputing that the Board of Trustees for the Village satisfies the employee position prong for 2201 immunity to apply. A policy determination, as we know from case law, involves balancing competing interests and making judgment calls as to what course of action will best serve those interests. Discretionary acts are those that involve personal deliberation and judgment and are unique to public office. In contrast, ministerial tasks are those that are done pursuant to a prescribed manner where in obedience to the mandate of legal authority, that's for all the case law that's on 2201. So is it ministerial if you have a report of damage to apparently city property that is impacting other property and the regulation says that you're supposed to investigate and repair? Is that ministerial or is that discretionary? In that case, I think it would be ministerial because of the existence of the regulation. Case law talks about the execution of a task that is absolute and certain. And in your example, because of the existence of that regulation in the hypothetical, that would be ministerial. We don't have that here. There's no evidence of that here where the timing of these repairs was concerned. And that's an important thing to note. Nobody's taking issue with how the repair was done. It's the timing of it. It was the delay, if you will, or the decision to delay the repair. The board met in October, dispatched its maintenance supervisor to go out and investigate the problem. He did so, came back for a November board meeting, reported what he found. It was at that point that the board deliberated and there were concerns, competing concerns, which is the quintessential definition of a policy determination. The concerns were that the board thought at the time that Railroad Street would need to be completely torn up in order to effectuate these repairs. Winter was coming. There's also a concern. There's a concern for the board about potholes and other problems with the road being created by winterizing activities, salting, plowing, whatnot. So the thought was, if we dig up this road now, we're going to make travel on this particular street treacherous. So let's wait until spring. The weather will break. We'll go out and make the repair. And that's exactly what happened here. Let me ask you one more question. Sure. I understand the statute of limitations has limited the plaintiff's recovery, if any, to a certain period of time. Correct. But as I understand the facts, there were complaints made for several years prior to that. Is it your position that because of the statutory bar for any claims before that, that we don't consider the actions that were or were not taken prior to that time as well? That's correct. And in addition to that, if you look at the operative complaint here, it was before the court when the case went to trial. The second amended complaint doesn't detail any of those complaints. And it's the two complaints that were testified to at trial, Mrs. Clark testified that she contacted the mayor, I believe, in 2002, and advised him that the catch basin that was on the property was retaining water. She also claimed or testified at trial that she made a similar ‑‑ I'm sorry, I need to correct the statement I just made. The complaint in 2002 was to a part‑time maintenance worker for the village, not the mayor. In 2007, Mrs. Clark testified that she contacted the mayor and again notified him that the catch basin on the property wasn't draining and it was retaining water. The complaint doesn't have any of that in it. The complaint and what the case was about was what the village did in the wake of the September 13, 2008, flooding event, the February 26, 2009, flooding event, and the March 9, 2009, flooding event. That's what's in the second amended complaint. Nothing about the earlier stuff and nor could it be because of the statute of limitations issue. But the fact that they can't claim for that doesn't eliminate what happened. So, but that's okay, you've explained. Thank you. Yeah, it's our position that if you look not only at this, let's also talk about the evidence that came out at trial. We had a lot of focus at trial on what the village did in the wake of that first actionable flood, the September 13, 2008, flooding event, what the village did for neighbors of the plaintiffs. There was one neighbor in particular, Sandra Reed, there was a lot of testimony at trial about the village right after that storm used actually a fire department truck to go out and pump water off of that woman's property across Railroad Street. And that they also dug a trench on the south side of Railroad Street. So again, the testimony, not only does the complaint focus on what the village did or didn't do after September 13, 2008 flood, but we also had a focus at trial on this is what the village was doing for other people after that flooding event, but they didn't do anything for me and they waited several months before they fixed the drain tile. So I think not only the statute of limitations issue, the pleadings itself that were at issue, and the trial testimony, the focus of it supports that really we're looking at a snapshot in time and it wasn't about what was going on in 2002 or 2007. The case is really about what was going on after the September 13, 2008 flood and the other two flooding events. In assessing 2201 discretionary immunity, the Supreme Court has held that adopting and selecting a plan for public improvements is of course discretionary, but once you carry that out or execute it, it becomes ministerial and you have a duty to see to it that the work is done in a reasonably safe and skillful manner. From those pronouncements, a general rule has emerged, and I emphasize general, that an act or omission of repair or maintenance is a ministerial function to which 2201 immunity doesn't apply. And the gist of our argument is that this case doesn't fit the general rule because of the trial testimony. And 2201 immunity analysis has to be done on a case-by-case basis. It's the facts of each case that are analyzed, the circumstances of each case that have to be analyzed as part of that analysis. And we've cited in our brief decisions from several courts that concern timing of repair work. And there have been instances based on the facts in those cases, and we submit the facts here are similar, where an act or omission of repair or maintenance, and specifically a decision about when to effectuate a repair, has been deemed a discretionary policy determination that was entitled to 2201 protection. Those cases are in Chicago flood litigation. We've cited Richter, and then in our reply we also cited Nichols, which when it was cited in our reply, it was not yet published. It had just come out. Now it has been published. So I wanted to note that for the court today. In this case, an evaluation of tradeoffs and a judgment call occurred relative to the village's handling of the storm sewer system repair work. And again, I would cite Mayor Pinter's testimony at trial for that, which I've already discussed this morning. There's no evidence that a statute regulation was there to guide the village or mandate that it had to do the repair work by a certain deadline. Plaintiff's cases are all distinguishable in that they involve situations where mandatory compliance with a regulation or a statute rendered it impossible to classify the decision as a discretionary policy determination. Putting aside the issue of immunity, I want to make sure I also touch upon the two other claims of error relative to our request for post-trial relief, and those involve proximate cause evidence or the lack thereof at trial. In this case, it's our position that the plaintiff failed to introduce evidence from which a reasonable jury could conclude that the village's failure to maintain the storm sewer system, or specifically a partially compressed drain tile underneath Railroad Street, was the proximate cause for the flooding on their property. Here, there was no evidence of proximate cause favorable to the plaintiffs at trial. Their expert, Edwin King, failed to deliver on that subject. We've quoted the specific policy in our brief where he was asked point blank, do you have an opinion to a reasonable degree of engineering certainty as to what caused the plaintiff's flooding? Answer, digress, digress, digress. Can I use an example? Plaintiff's counsel actually had to pose the question to him a second time because he didn't get what he wanted the first time, and then after all that, we had three jury questions that came out for this particular witness about proximate cause, so the jury didn't hear a proximate cause opinion either. The only proximate cause evidence in this case was supplied by the village and its expert, David Horton. His testimony established that the partially crushed drain tile was neither the cause in fact nor the legal cause of plaintiff's flooding woes. Were there questions about him, about his testimony? There may have been, but not on proximate cause. Weren't there questions about most of the testimony? There were, but I think it's telling that three jury questions came out on proximate cause after Mr. King testified. And again, we put the passage in our brief. There's no spin, euphemism. I didn't paraphrase it. It's quoted exactly what that exchange was between plaintiff's counsel and Mr. King. In contrast, the village's expert, when asked, testified that the catch basin on plaintiff's property was at a higher elevation than surrounding land so that it was constrained in terms of water intake. Our expert also testified about various summits and apexes on plaintiff's property such that water would pool on that property before it ever reached the catch basin. That's two minutes. Thank you. We also had perhaps most damning to plaintiff's case. Our expert testified that even the most pristinely maintained storm sewer system could not have handled these particular rainstorms, one of which was a 100-year rainstorm, the one on September 13, 2008. I want to turn very quickly as well to the last proximate cause argument that we had. Can I quickly ask? Sure. Did plaintiff introduce any evidence that if this particular drain pipe had been pristine, it was able to handle the record rainfall? No. No. There was no testimony by their expert on that subject at trial. The last contention of error we've raised is that the plaintiffs failed to introduce evidence from which a reasonable jury could conclude that their mold and structural damages were proximately caused by the last three flooding events as opposed to all of the other non-actionable flooding events from 2002 forward. And that relates to the statute of limitations ruling that we've already touched upon a little bit this morning. That argument got short-stripped at the trial court for a couple of different reasons. One was that the plaintiffs testified as to when they first noticed the mold damage in their home, which was in 2009. They testified that the floods intensified from the September 13, 2008 date forward. And they testified about their successful cleanup efforts after all the earlier flooding events. But that testimony did not fill the proximate cause gap. The trial court here granted a motion in lemonade that prevented the plaintiffs from offering proximate cause evidence as to both the timing of their damages and what caused it. And just because the plaintiffs didn't notice mold growth in their home until 2009, of course, doesn't mean that it wasn't there. Their own expert testified at trial that mold growth can be obscured to the naked eye. The testimony that the damage was minimal from earlier non-actionable floods rang hollow in light of the fact that originally, plaintiffs filed a complaint in this case seeking significant damages for all of those other flooding events. And the plaintiffs' mold expert himself could not opine about what floods caused the particular damages at issue here. The jury was unguided and left to speculate as to that facet of proximate cause as well. For all of these reasons, we're asking that the court today vacate both the March 27, 2014 order, the August 7, 2014 order, those are the orders that enter judgment on the jury's verdict in this case, the order that denied our post-trial motion. We're asking for the entry of judgment notwithstanding the verdict by this court or bring me into the trial court with instructions to do so. Thank you very much. Thank you. Thank you. Mr. Inman-Hintz? Yes, thank you. Good morning. Good morning. Before I say that, good morning. Your Honors, I think that the case law is clear that not every act or mission by a municipality entitles it toward immunity under 201. The problem that I have and the problem I think that we all have here in this case is determining where you can draw the line. As I pointed out in my brief, there is considerable disagreement as to what is a policy decision, what is an exercise of discretion as opposed to ministerial actions. Unfortunately, I can't stand here and give you an easy litmus test. And as you can see by the case law, there are some cases that are, you know, they seem to be conflicting. But I think that in the early case law, which I cited, it gives us some idea of the intent of the immunity statute. The Supreme Court in the Chicago flood litigation quoted seven cases. It stated that a municipal corporation acts judicially or exercise discretion when it selects and adopts a plan in the making of public improvements such as constructing sewers or drains. But as soon as it begins to carry out that plan, it acts ministerially and is bound to see that the work is done in a reasonably safe and skillful manner. The council quoted the same section. Now, I'm not saying that all maintenance is ministerial. That's just too simple of an answer. We've seen cases where there has been some maintenance projects and they have been considered to be policy discretion. But I think the appellate courts and the Supreme Court still cite this case for guidance. So I think that's something to start with. So what's the plan? Pardon me? What was the village's plan? Well, I don't think that they have a plan. I mean, that's my contention is that they really didn't have a policy or a plan. Their plan was to put it off as much as possible. And if you look at some of the evidence that was entered into the trial court, for instance, the minutes of the village board meetings, they don't mention anything about this concern about the roads or chuck holes or anything like that. There's nothing in there, nothing in any previously established plan, like there was in Nichols or there was in Richter even. And I'd like to compare those two cases, let's say the Nichols case to the case at Hander, to kind of give us some further guidance if that's possible. Both cases involved issues with storm sewers and sewer systems. Both involved flooding and the need for maintenance of the sewer systems. And both municipalities were claiming immunity pursuant to 2-201. But I think there's some significant differences in this case and specifically in the Nichols case at this time. In Nichols, answering your question, there was evidence of a longstanding policy to address the deficiencies of the Chicago Heights sewer system long before the incident, which gave rise to the lawsuit. You're probably familiar with the case by now. They've had letters to the Thorn Creek Sanitary District outlining the years and years of rehabilitation efforts they had done over a decade. And they set out their plan of attack and their schedule of compliance. They also discussed the money they had spent in fixing the manholes, repairs, the rehab of the sewer mains and inspections. There were several ordinances passed in that case documenting their policy and authorizing the work to be done and the payment for the work to be done. And I think the planning and the effort in that case was impressive given their budgetary restraints. In contrast, the Village of Lamoille has no evidence of any policy decision prior to this litigation that addresses the repair of the storm sewer at the clerk residence. The only documentation we have from the Village of Lamoille is what I mentioned earlier was the minutes of the meeting. In 2001, the minutes say that the storm sewer was discussed at the west end of town. Ways to repair it, Railroad Street, Morton Street was also discussed. The property that the clerks owned was on Railroad Street. In 2006, storm sewers were discussed, but the board decided to wait until there was a problem since there was a more important financial issue at this time. So in five years, nothing was done in the Village of Lamoille. Even in October 2008, after the initial flood, the 100-year flood that they're talking about, Mr. Stouffer addressed the possible black tile on Railroad Street and the town was to inspect. That's it. There's no mention in any of those minutes in any documentary evidence that there was any policy regarding what to do or concerns about the chuck holes or the street or anything of that nature. And there was no work done at all to address the sewer problem in Lamoille until after this case was filed. There were never any ordinances or policy decisions produced except the testimony of Mayor DePinter at his deposition and at trial, and this was after the litigation. So if there was any policy, I submit to this court that they're clear that they did not apply that policy when they came to the rescue of Sandra Reed, which counsel mentioned. If there was a policy in place about worrying about concerns about tearing up roadways or in this case tearing up a railroad berm, in Sandra Reed's case, or bringing out a fire trunk, they didn't apply that policy evenly and I question whether it was a policy at all. Isn't that the Village's point, that they didn't have a policy and therefore these repair decisions were discretionary in and of themselves? Well, I think that there's a requirement, Your Honor, that there be some kind of a policy in place, that there be some kind of a policy determination in place for this to qualify under the Tort Immunity Act. And if you note the Nichols case, I'm sorry to interrupt you, go ahead. So is that your claim that they didn't have a plan or a policy? That's right, Judge. They didn't have a plan or policy. Now there's obviously testimony at the trial from Mr. Pinter stating that that was their concern, but I don't think that there's enough evidence of a policy or a plan in place here to address the sewer concerns. I mean, I think that it's more likely their plan was to put this off as long as possible and not do anything about it, which is clearly, and conflicts with the statute, requires them to keep their property in a safe manner, a safe condition for their users. Policy determinations should have some kind of a discussion where they're requiring the municipality to balance competing interests and make a judgment call as to what solution will best serve each of those interests. And I submit that I don't think there was any clear policy in this case. The only policy the court in the trial court felt, and as I do, and I hope that you eventually, that the village simply did nothing in this case, and which obviously didn't take any consideration of the clerks or any of the other neighbors. I also don't think that there was any evidence of really any discretion used in the repair of the storm sewer. There is no specific statute like there was in like the Snyder versus Coran Township case where there was this traffic where you had a placer traffic signs and things of that nature. But this is, when asked the village's approach to fixing the village's property, Mr. Lugman said simply, we fix it. And if the repairs were beyond his capabilities, he would have to consult with the village board. But there really was no evidence of discretion used in repairing the storm sewer. The damaged sewer was removed and new one was inserted. There's really only one way to do it. There are variations, of course, on what materials to be used or whether to use a shovel or a backhoe. But I submit that I think these decisions are more akin to those when made when you're driving a nail, as was suggested in the Prosser quote than, for instance, when and where to drive bridge pilings next to the Chicago River as in the Chicago flood litigation. The handling of the storm sewer repair, I think, was ministerial and there was no plan or judgment about this. It was just an execution of a set task. When you have a crushed tile, you dig it up, put in a new one, and fill it back up again. Was it established when the tile became crushed? No, I don't think that was ever established when it was crushed. I think it was established that there were flooding problems and that it should have been investigated at that point in time and repaired, but it wasn't. So, no, I don't know if there's anybody, there's no testimony that really anybody knew exactly when the tile was crushed. At the time of the trial, had the repairs been made? At the time of the trial, the repairs had been made, yes. So did your expert testify that on the day of trial we received a record rainfall, the repairs that were made were suitable to carry that amount of water? Yes, he did. He testified that, as a matter of fact, there was some severe flooding in, I think it was, forgive me if I'm wrong on the year, I think it was 2013, and he testified he went back and on the day of the flood there was water sitting in the yard, which is what was designed to do, and the next day the water was gone. There was also photographs taken by the next door neighbor which I introduced in the evidence. One day, I think it was May 29th, the water was sitting in the yard. The next day the water was gone. Obviously, the way that the tile is supposed to work is it's supposed to hold water and then release it slowly. And that's what they did. After repairs were done, it was working. And Mr. King did testify after that. In sum, I'm convinced that the legislature never intended to allow municipalities to avoid their duty to keep their property or infrastructure in a safe condition by simply deciding that they have more important things to do. Not under these set of facts. I think the village, in this case, consistently fails to address their duty imposed upon them by Section 3-102 to keep their property in safe condition, and they don't really address it. I think they just say they don't have to because they decided that they shouldn't do something different. It doesn't make any sense, and this is just my argument. It doesn't make any sense to impose the duty to maintain their property in a reasonably safe condition, but then allow them to simply manufacture an excuse not to do it. That's basically what I have on the torrid immunity issue. As far as the proximate cause of the flood, it seems to me that the village is stating that because Mr. King didn't say the magic words, the proximate cause is that he failed to establish that the flooding was caused by the black storm sewer. What he did, and I'm not going to repeat my arguments in my brief, but I think there was sufficient testimony by Mr. King to establish that the storm sewer was blocked and that it caused the flooding. He submitted an example to the jury. I think he's an excellent communicator.  Even Mayor Pinter admitted on the stand that if the storm sewer is blocked, the property is going to flood. He said that in his testimony on cross-examination. If the flooding persists, it makes sense to check the storm sewer. I think everybody is capable of understanding when something is blocked up like your kitchen sink that you've checked the drain. It's a simple process, and I think Mr. King supplied the jury with enough information for them to make that connection. I've been accused of abusing ancient case law, but the case law is still good, and I think that it shows that these issues have been decided a long time in favor of the plaintiffs. The fact that there is a large flood does not excuse the village from repairing or maintaining a storm drain. By the way, Council's reference to the questions that the jury had, questions by a jury are not evidence. They're not evidence of a lack of proximate cause either. I think that they're irrelevant. Any answers given to those questions would be relevant, but not the fact that there were any questions whatsoever. I think that the jury in this case obviously felt there was proximate cause in this case, and they also considered the plaintiff's own negligence and reduced their verdict by 40%, so I think they addressed the issues correctly. With regards to the mold, proximate cause of the mold, I think again the village is attempting to spin the evidence here. They argued that the plaintiff's testimony is not persuasive, that their testimony rings hollow. I mean, these are terms going to the weight of the evidence, and I think that what they're asking to do is re-weigh the evidence in this case with regards to the decision of the jury. Mr. Zabrowski testified as to the type and the level of mold present in the Clark house when he inspected it, and he testified that it was consistent with the house that had been flooded. He testified he would not expect mold to form in a structure to experience flooding less than 24 hours. The testimony was clear in this case that there were three floods that subjected the Clark home to flooding in events that lasted for an extensive period, eight and seven days. So I think that the testimony of all the witnesses fit together like a jigsaw puzzle here, and he came up with a clear picture. That's two minutes. Thank you. What was the charge for mold remediation? The cost? Well, there are three separate estimates, if I recall correctly. In the initial one, I think it was like 65, and it went up to like 10 or 12, and then I think the last one was around 18. Have the repairs been made? The repairs have not been made because we haven't received any money yet. And I think they testified that they... If it makes the house uninhabitable, you would think the repairs would have been made. If they could afford it, and I think they testified that they were unable to afford to make any repairs at that point in time. They were left with no other choice but to file suit. In summary, I think the jury properly considered the evidence in this case. There was no speculation or conjecture. The last three floods could have been the cause of the mold, and the jury had a right to find in favor of the plaintiffs. And that's all I have, unless you have any more questions. Thank you, Mr. Vance. Thank you. Ms. Turriello, any rebuttal? Thank you. I have just a few follow-up points. Counsel, and perhaps you spoke, but kept talking about that nothing was done by the village in this case until suit was filed. The case was filed here September 11, 2009. The repair work was done in March of 2009. So everything had been done by the time the suit got filed. You know, I can't come before the court and suggest that the line as between discretionary and municipal acts is always clear. It is a fine line, and in light of the landscape of case law that's out there, it's admittedly difficult to draw that line. But here, based on these facts, this case falls within the ambit of discretionary immunity. And again, I would reference Mayor Pinter's testimony. To say that the plan of the village was to put it all off and do nothing, there's no support for that. That's counsel saying that, but there was no testimony to that effect. And he could have cross-examined Mayor Pinter about the lack of any documentation and board minutes about the village deliberating about what to do. But you didn't. The testimony was that, again, when the maintenance supervisor came back to the board, and Pinter testified as well about a process here, that if a repair was something that was going to be involved and very expensive, the maintenance supervisor had to bring it in front of the board. If it was a repair that was easy, not expensive, simple fix, he could go on and do it himself. That wasn't the case here. Maintenance supervisor went out to the property in October, early November, put his hand down the catch basin, realized that the water wasn't moving, it was stagnant, came back to the board to report the results of the investigation. And again, the prevailing thought among the board members, as testified to under oath by Mayor Pinter, was that the board thought that this project was going to involve completely ripping up Railroad Street. With the oncoming winter, salt plowing, chuck holes created from all of that, the thought was that this was going to be treacherous travel on Railroad Street if we do this right now. Let's wait until the weather breaks, and we'll fix it. And that's exactly what they did. And you've got other case law where the same kind of decision was made and 2-2-1 immunity applied. In Illinois-Chicago flood litigation, for instance, that case, a television news crew spotted a breach in the tunnel below the loop. And the city spent a couple of months taking pictures, investigating, trying to figure out who's going to do the repair work. 2-2-1 immunity applies. There was a delay. Same kind of allegations. You did nothing for several months, and now we have all these damages. Same case, same sort of allegations. Same thing in Richter v. College of DuPage. There, we have the sidewalk slab deviation. There's paint on it at the time the pedestrian student falls. The testimony in that case was that you could physically alter the sidewalk, and that was one course of action that the maintenance and ground supervisor could possibly do. He had unfettered discretion to handle it however he wanted to, but he didn't do that because of a freeze-thaw cycle. The three- to four-month time period in the winter wasn't an ideal time to do grinding and physically alter a sidewalk because the slabs would continue to move, and then the college would be faced with the same tripping hazard, notwithstanding its repair efforts. Again, a decision was made to hold off doing a repair, and that was entitled to Section 2-2-1 immunity. We have similar facts here. Council might not like the testimony at trial, but it is what it is. I don't think we need a board minute meeting, and I don't know of any case that says we need one where that was memorialized. The mayor's testifying under oath at trial that, hey, look, we had to make a judgment call. We had to balance interests, competing interests. I think council did reference a minute meeting that talked about budget concerns with respect to repair work on the sewers. That's something you see in case law all the time where 2-2-0-1 immunity has applied. Budgetary concerns, constraints. That was the case in the Nichols case. I don't think it's the timing necessarily that dictates whether or not it's discretionary policy decision-making. It's that was there deliberation? Was there an affirmative decision-making process? Was there reasoned deliberation? If there were and they put it off, I suppose in Richter, for instance, that repair in that case was well over a year. Well over a year after the accident had happened that the student tripped and fell. It may have almost been two years if I recall. And again, immunity still applied. The focus is on that deliberative decision-making, affirmative decision-making process. And we had that here. Just quickly on proximate cause, we're at jury's hearing evidence where you had neighbors with functioning catch basins and who had no problems at all with the drain tile. And you had neighbors that weren't connected to the storm sewer system at all. And they all had flooding on their property, massive destructive flooding on their property. You have to have an expert. Have to have an expert that's going to come in and say, yes, yes, this partially crushed drain tile is what caused this land to flood. You have to have that. And the trial court recognized the need for an expert on this. And the point is their expert didn't deliver, did not deliver on that subject. Counsel's time. Thank you very much, Your Honors, for your consideration. Any other questions? Thank you. We thank both of you for your arguments this morning. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The court will stand in brief recess for a panel change.